IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| JUSTIN RAY WEBB, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 6:23-CV-03203-RK |
| ) | |
| MICHELE BUCKNER, ) | |
| ) | |
| Defendant. ) | |

### ORDER

Petitioner Justin Webb, a convicted state prisoner, has filed this federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. After careful consideration and for the reasons set forth below, Petitioner's habeas petition is **DENIED**.

I.  **Statement of Facts**

The underlying facts of this case are as follows, as set out by the Missouri Court of Appeals on direct appeal:

> On October 15, 2012, four-year old Victim lived in Holt, Missouri with Webb (his father), Melissa (Stepmother), and his younger brother. That afternoon, around 1:30 p.m., Webb arrived home from work. Stepmother and Brother sat in the living room to play a board game, while Webb was doing something in the kitchen. Victim walked down the hall toward Stepmother and Brother when Stepmother approached Victim and kicked him, knocking him to the floor. Victim tried to get away, but Stepmother kept kicking him repeatedly between the legs and in the abdomen, eventually causing Victim to vomit between screams. Brother tried to get Webb to stop the attack, but Webb did nothing. Stepmother eventually stopped, and Victim stumbled outside and fell on his knees and then to the ground. Brother told Webb, who told Brother to get Stepmother. Victim's eyes were closed, and Webb did something to Victim's mouth that Brother described as "holding up his tongue," and that investigators later believed to be an effort at CPR.
>
> A call was made to 911 around 3:15 p.m., reporting a four-year-old child who was not breathing. When paramedics arrived, they observed Stepmother on the front porch performing CPR on Victim, Webb standing by, restraining a dog, and Brother off to the side. One of the paramedics asked what happened, and neither Webb nor Stepmother responded. The paramedic asked again, and again neither responded. Eventually, the paramedic was advised that Victim "had been kicked in the head at the fair a couple of days ago, had woken up with a bellyache, and now this." The paramedic asked how long Victim had been down and not breathing, and neither Webb nor Stepmother responded. The paramedic asked a

total of three times how long Victim had not been breathing, and she never received an answer. Victim's heart was not beating, which suggested to the paramedic that Victim had not been breathing for a while;[1] she also observed dark discolorations around Victim's head. At that point, they put Victim in the ambulance and headed for the hospital.

On the way to the hospital, the paramedic tried to intubate Victim to get him oxygen, but she was unable to get his jaw open because it was rigid from the onset of rigor mortis.[2] Upon removing Victim's clothing, the paramedic observed "bruising around the side of the head on the right side, behind both ears, [and] down the back of his neck"; she also observed that Victim's penis was bruised. Victim had a "coffee grounds appearance coming from his nose and his mouth," which the paramedic said was "sometimes an indication of internal bleeding." When they arrived at the hospital and rolled Victim over, the paramedic observed large bruises on Victim's buttocks and lower back.

At the hospital, three physicians and all of the nursing, respiratory, laboratory, and X-ray staff were assembled in preparation for Victim's arrival. Hospital staff again tried to secure Victim's airway but were unable to open his jaw. Hospital staff noted the onset of rigor mortis in other areas of Victim's body besides his jaw. Victim was pronounced dead at 3:50 p.m.

The medical examiner performed an autopsy of Victim the next day. The first thing the examiner noticed was that Victim was underweight. The examiner documented the following injuries to Victim:

> Extensive contusions and abrasions were found on the back, sides, cheeks, chin, forehead, and temples of his head. His outer lips were bruised, and his inner lips were lacerated. Internal hemorrhaging was found on the posterior regions of his head and neck. He had extensive contusions and abrasions on the front, back, and sides of his torso, sacrum, and buttocks; his entire torso was discolored. His penis and scrotum were bruised, and his penis had two lacerations on its dorsal side. Multiple contusions and abrasions were located on all four of his limbs. Four healing broken ribs were discovered. Hemorrhages were found in his lungs, pancreas, diaphragm, and small bowel, and several lacerations located in multiple areas within his gastrointestinal system.

Victim had a thousand milliliters of blood in the abdomen, indicating that he had severe internal bleeding. The examiner determined that Victim's most significant

---

[1] Paramedic testified that, if Victim's breathing had stopped shortly before the 911 call, she would have expected to still observe electrical activity in the heart.
[2] The paramedic testified that rigor mortis typically begins in the small facial muscles. The medical examiner testified that the timing of the onset of rigor mortis varies, but it occurs faster in children and faster where there is an element of infectious disease, as was the case here.

injury—and the ultimate cause of his death—was a laceration in the small bowel. The examiner testified,

> [I]njuries like this are caused by blows to the abdomen in young children, and what happens is that the skin surface is basically pushed all the way to the vertebral column, which is bone and it's hard. So all the tissues caught in between are split or torn or lacerated. So he has that kind of injury in the head of the pancreas; in the omentum, which hangs off of the stomach; the stomach is ruptured in two places; and the small bowel is split; and the tissue that supplies blood to the colon is also lacerated. So—and these are all organs that would have been caught—or, these are all tissues or organs that would have been caught between the blow and the vertebral column.

According to the examiner, a person suffering this kind of injury will "go into shock pretty rapidly, especially with this kind of blood loss."[3] And, "the dumping of all of these intestinal contents free into the abdomen . . . sets up a terrible infection, and that's what[] caus[ed] th[e] discoloration over [Victim's] abdomen." The examiner indicated that this kind of injury would be immediately symptomatic and cause extreme pain; he surmised that Victim would "probably be rolling around in pain until he passe[d] out."[4] He further indicated that, if untreated, this kind of injury is fatal within a matter of hours. The examiner determined the cause of death to be "[b]lunt force injuries of the thorax and abdomen," and the manner of death to be homicide.

    Two days after Victim's death, both Webb and Stepmother were interviewed by an investigator with the Major Case Squad. When asked about Victim's bruising, Webb claimed that Victim bruised easily, fell often, was easily injured, and had a high pain tolerance.[5] Webb further explained that giving Victim Vitamin D milk helped lessen Victim's bruising, but they had been out of Vitamin D milk for over two weeks at the time of Victim's death. Webb suggested that Victim had a habit of chewing on his own lips and that a heart defect caused Victim to burn energy at a high rate, leading to Victim being underweight. Webb suggested that the injuries to Victim's abdomen may have occurred the evening before his death, when the family went to a fall gathering where Victim was playing on a hay bale and an older child jumped off the hay bale and landed on Victim. Webb suggested that the injuries to Victim's back and head occurred when Victim

---

[3] The examiner testified that loss of one and a half liters of fluid in a 150-pound adult male would be fatal. Victim had a liter of fluid in his abdomen, and he weighed only 41 pounds.

[4] Because of the nature of Victim's injuries, Brother was immediately removed from the home and placed with a foster family. Shortly thereafter, while playing a game on the floor with his foster mother, Brother spontaneously began rolling around on the floor and then said that is what happened to Victim "when his mommy kicked him."

[5] When asked how he knew Victim had a high pain tolerance, Webb described an incident where Victim was playing in the backyard when he fell and hit his testicles, causing them to swell to the size of a softball, and they were able to treat his injury with just an ice pack.

3

climbed the hay bale a second time and slipped off. When asked about the injuries to Victim's penis, Webb claimed that, on October 12, while Webb was in the kitchen cooking, he heard Brother and Victim in the bathroom. Apparently, Victim had been using the bathroom when Brother suddenly needed to go, and Brother did not wait for Victim to move before putting his seat on the toilet and smashing Victim's penis. Also on October 12, Webb observed a knot on Victim's head when Webb came home from work; he asked about it, and the boys said Victim fell off a truck. Stepmother claimed to know nothing about it.

When asked about the day of Victim's death, Webb said he arrived home around 1:30 or 2:00 in the afternoon, and Stepmother told him that Victim had been sick. So Webb checked on Victim, who appeared fine, and Webb then went to bed, as he had worked all night the night before. Webb said that he heard Victim ask for a drink of water, and shortly thereafter, he heard Stepmother scream for Webb to get up because they needed to take Victim to the hospital. According to Webb, Stepmother carried Victim outside, and Victim was throwing up down her back while she was on the phone with 911. Webb said that Stepmother then placed Victim on his back on the deck, per instructions from the 911 operator, and began CPR. Webb said that Stepmother did chest compressions while Webb provided breaths. Webb said that, when the paramedics arrived, they did nothing to assist either him or Stepmother, and instead just loaded Victim into the ambulance.

When the investigating officer advised Webb that Victim's fatal injury was to his abdomen and asked how that might have happened, Webb suggested they stop their meeting. Webb, nevertheless, continued describing other injury-producing events that occurred to Victim in the days preceding his death. At two different points in the interview, Webb discussed that the last time they had taken Victim to the doctor, it was for nausea, vomiting, and bruising. According to Webb, the doctor could not describe what was causing the bruising but had provided some anti-nausea medicine so Victim could eat and keep food down.

Before his death, Victim attended a preschool for children with developmental delays.[6] One of his teachers described him as "a very athletic little boy." She said that "[h]e liked to climb. He liked to run and play. . . . [H]e was very agile. He was not at all clumsy." In November of 2011, during a class bathroom break, Victim's classroom teacher Pamela Miller noticed severe bruising on Victim's bottom. When she asked what happened to him, Victim said "Daddy get mad at me and hit me with a—with a stick."[7] He also said, "I was on daddy's boat and I fell and Daddy get mad." Again on January 10, 2012, Miller noticed bruising on Victim's bottom and, when she asked Victim about it, he said, "Daddy get mad at me and hit me with a switch." That same day, Miller contacted the child

---

[6] Victim had demonstrated some speech language difficulties.
[7] During his interview with the investigator, Webb indicated that, when he was a child, his father punished him with a switch.

4

abuse hotline.[8] As time progressed, Miller noticed more bruises than she would expect from normal play, and she notified Victim's family of her concerns. Multiple emails went back and forth, and Victim's attendance became irregular.[9] Between February and April of 2012, Victim missed 21 out of 37 school days. On April 20, 2012, Stepmother removed Victim from his preschool.

Victim returned to his preschool in the fall of 2012, and he was put in Staci Bonderer's class. On August 20, 2012, Victim attended a back-to-school open house, and Bonderer noticed that Victim was much thinner than she remembered him being the prior spring. On August 23, the first day of school, Bonderer noticed that Victim acted very tired and seemed very frail. Victim asked for more drinks than most children,[10] and he did not play during recess time. The next day, when Bonderer took Victim to the bathroom, he said that "a monster plays with his pee-pee." Victim refused to play during the day and instead laid at his table with his head down. Later, on the way out to the bus, Victim told Bonderer that sometimes he didn't feel good. Bonderer asked him what hurts when he feels bad, and "he said that it hurts when his mom kicks him in the stomach with her foot." Bonderer asked Victim if his mom was happy or mad when she kicked him with her foot, and he said she was mad; he also remarked that she had made him swallow a Pop Tart. On August 27, 2012, Bonderer noticed that Victim had scabbed-over teeth marks on his lips; when she asked about it, Victim said that Brother pushed him off the stroller. On August 31, 2012, Bonderer again noticed that Victim was very lethargic and did not play much at playtime. She also noted that he cried when it was time to go to the bathroom and did not want to go.

Following Labor Day weekend, Victim attended school on only Friday of that week (September 7, 2012), and he had bruising on his arms and legs, and it was mostly on one side of his body. Bonderer contacted the school counselor to have her discuss the bruises with Victim. When asked how he got the bruises, Victim said he fell off a boat. An examination of Victim revealed a total of nine bruises, with some on his leg and others on his cheeks and eyes. Victim also had a scabbed-over bite mark on his back. A report was then made to the child abuse hotline.[11] On September 20, 2012, Victim came to school with a bruise on his cheek. Victim told Bonderer, "my mom said it's none of your business. She said, tell you none your . . . businesses." That was the last day Bonderer saw Victim, as he did not attend school for the remaining weeks before his death.

Both Webb and Stepmother were criminally charged with respect to Victim's injuries and death. Stepmother pled guilty to second-degree (felony)

---

[8] Though the record is unclear, it appears that the Department of Family Services (DFS) responded to Victim's home, but looked only for whether there was sufficient food and not whether Victim was being abused.

[9] During his interview with the investigator, Webb acknowledged receiving the reports from Victim's teacher about concerns over injuries.

[10] The medical examiner testified that internal bleeding can lead to dehydration.

[11] Again, for reasons not explained in the record, DFS responded by investigating whether there was sufficient food in the home and not whether Victim was being abused.

murder and felony abuse of a child. Pursuant to a plea agreement, she was sentenced to concurrent terms of 20 years for felony murder and 15 years for abuse of a child. Webb was charged, as an accomplice, with second-degree (felony) murder and first-degree endangering the welfare of a child.

At trial, Webb testified in his own defense. Webb testified that he returned home from work and running errands around 1:30 p.m. on October 15, 2012. He testified that, when he arrived home, Stepmother met him at the door and had a discussion with him about Victim. As a result of the conversation, Webb went to Victim's bedroom to check on him. Victim was lying on a pallet on the floor. Webb asked Victim what was wrong, and Victim said he was sick to his stomach. Webb then brought some items in from his truck before going back to Victim's bedroom to see him again. Webb claimed that Victim again complained that his belly hurt and said that he thought he ate too much. Webb then went to bed.

Shortly thereafter, Webb heard Victim and Stepmother walking down the hallway, and Victim asked for a glass of water. Webb fell asleep but was awakened when Stepmother screamed at him, telling him to get up because they needed to go to the hospital. Webb claimed that Stepmother was carrying Victim out to the car and that he saw Victim look up at him just before vomiting all over Stepmother's shoulder. As Webb was putting Brother's shoes on, Stepmother told him to grab her cell phone. Stepmother then ran back inside, telling Webb that Victim had collapsed. According to Webb, Stepmother then called 911 and was advised to lay Victim on his back and start CPR, which they did until the ambulance arrived and took Victim away.

Webb acknowledged knowingly leaving Victim in Stepmother's care, custody, and control on multiple occasions, including September and October of 2012. Webb also acknowledged that he and Stepmother had been reported to DFS based upon Victim's bruises in September 2012. But Webb denied knowing that Victim had missed two to three weeks of school right before he died.

The jury found Webb guilty as charged, and the trial court sentenced him to consecutive terms of thirty and seven years' imprisonment.

(Doc. 4-7 (footnotes in original).)

Petitioner filed a direct appeal, and the Court of Appeals affirmed the judgment.

In a Rule 29.15 motion for post-conviction relief, Petitioner claimed ineffective assistance of counsel based on his trial counsel's failure to object to evidence of and argument about Stepmother's guilty plea. The motion was denied. The Missouri Court of Appeals affirmed after an evidentiary hearing. (Doc. 4-14 at 1.) On review, the Missouri Court of Appeals applied the *Strickland v. Washington*, 466 U.S. 668, (1984), test for ineffective assistance of counsel. (*Id.* at 12.) The court found counsel's failure to object was reasonable trial strategy. (*Id.* at 13.) Petitioner then filed this petition for writ for habeas corpus.

6

## II. Standard

State prisoners who believe they are incarcerated in violation of the Constitution or laws of the United States may file a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Before doing so, however, petitioners must exhaust their state remedies. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). "[H]abeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotation and citation omitted).

This Court's review of the petition for habeas corpus is limited by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. *Id.* at 97. AEDPA "bars relitigation [in federal court] of any claim adjudicated on the merits in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Harrington*, 562 U.S. at 98. Accordingly, a state habeas petitioner is not entitled to relief unless the state court proceedings:

> (1) resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d).

As to § 2254(d)(1), a state court violates the "contrary to" clause if it "applies a rule that contradicts the governing law set forth" by the Supreme Court, or if the state court "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a [different] result." *Williams v. Taylor*, 529 U.S. 362, 406 (2000). A state court violates the "unreasonable application" clause of § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. "It is not enough for us to conclude that, in our independent judgment, we would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Flowers v. Norris*, 585 F.3d 413, 417 (8th Cir. 2009) (citation omitted).

As to § 2254(d)(2), "a petitioner must show that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Perry v. Kemna*, 356 F.3d 880, 889 (8th Cir. 2004) (internal quotation omitted). A state court's factual

7

determinations are presumed correct and will stand unless the petitioner rebuts this presumption with clear and convincing contrary evidence. § 2254(e)(1); *Grass v. Reitz*, 749 F.3d 738, 743 (8th Cir. 2014). Additionally, federal courts afford great deference to a state court's credibility findings. *Smulls v. Roper*, 535 F.3d 853, 864 (8th Cir. 2008) (en banc).

### III. Analysis

In seeking federal habeas relief from his state conviction, Petitioner's sole argument is that his trial counsel was ineffective for failing to object to evidence and argument regarding his co-defendant's guilty plea.

In applying the standard of § 2254(d), the Supreme Court has explained that a state court's application of the otherwise correct governing principle must be "objectively unreasonable," that is, it must be more than merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (citation and quotation marks omitted); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable") (collecting cases). The same is true regarding a state court's determination of the facts: "erroneous fact-finding by the [state] court[] will not justify granting a writ if those courts erred 'reasonably.'" *Weaver v. Bowersox*, 241 F.3d 1024, 1030 (8th Cir. 2001) (citation omitted). On federal habeas review, the state court's findings of fact are presumed correct absent clear and convincing evidence otherwise. *Id.*; *see* § 2254(e)(1).

The Missouri Court of Appeals affirmed the denial of Petitioner's claim of ineffective assistance of trial counsel for failing to object to evidence and argument regarding Stepmother's guilty plea, as follows:

> In his sole point on appeal, Webb asserts the "motion court clearly erred in denying [his] motion for post-conviction relief pursuant to Rule 29.15 because the record established that [he] received ineffective assistance of counsel due to trial counsel's failure to object to evidence and argument presented at trial that [Stepmother] pleaded guilty to the charges in her criminal case in that, had proper objections been made, the case against [Webb] would have been much weaker and there is a reasonable likelihood that [Webb] would have been acquitted." We disagree that trial counsel's "failure to object" to evidence of [Stepmother]'s guilty plea resulted in ineffective assistance of counsel.
>
> "Failure to object to evidence is not sufficient, in and of itself, to constitute ineffective assistance of counsel." *Tucker v. State*, 633 S.W.3d 539, 542 (Mo. App.

S.D. 2021). Rather, "[i]n order to prevail on a claim of ineffective assistance of counsel for failure to object," the movant must demonstrate, among other things, that counsel's failure to object was not reasonable trial strategy. *Id*. Here, the motion court found that "trial counsel's decision to permit evidence of [Stepmother's] conviction at trial was a matter of reasonable trial strategy," and we find the evidence supports this finding.

Trial counsel testified that, despite being aware of case law holding guilty pleas of co-defendants are generally inadmissible at trial, he made the conscious and strategic decision not to object to evidence that [Stepmother] pleaded guilty to abusing and murdering [Victim]. Due to the overwhelming evidence that [Victim] died as a result of severe abuse and not accidental injuries, trial counsel's defense strategy was not to deny that a homicide had occurred, but rather to place the responsibility for [Victim's] death solely on [Stepmother] and to show Webb was unaware of [Stepmother]'s acts of abuse toward [Victim]. Additionally, trial counsel reasonably believed that [Stepmother] would testify at trial and equivocate in, or minimize her culpability for, [Victim's] death. Trial counsel did not want the jury to hear her testimony and infer that "someone else did it," such as Webb; instead, he wanted it to be "crystal clear" that [Stepmother], not Webb, physically harmed [Victim]. Evidence of [Stepmother]'s guilty plea placed the defense in a stronger position to argue [Stepmother] was solely responsible for [Victim's] death. In light of these considerations, we agree with the motion court that trial counsel's strategy was reasonable, and we find no merit to Webb's arguments on appeal that "[t]here is no possible or conceivable strategic justification for trial counsel's failure to object" and that trial counsel "was unable to articulate a valid strategic reason for failing to object."

Moreover, trial counsel testified that he had discussed this strategy with Webb prior to trial, and there was no evidence presented that Webb objected to the strategy. Where a movant agrees to a trial strategy, "he has no room to complain that this strategy somehow failed." *Prince v. State*, 390 S.W.3d 225, 237 (Mo. App. W.D. 2013); *see also State v. Collier*, 892 S.W.2d 686, 693-94 (Mo. App. W.D. 1994) (rejecting the movant's claim of ineffective assistance of counsel for stipulating to certain evidence where the movant agreed with the decision to stipulate).

Trial counsel's strategic decision not to object to evidence and argument relating to [Stepmother]'s guilty plea was reasonable, and thus Webb has failed to prove his claim of ineffective assistance of counsel. *See Prince*, 390 S.W.3d at 237 ("A court will not find ineffective assistance where the conduct complained of by the accused involves counsel's use of reasonable discretion in a matter of trial strategy."); *see also Tucker*, 633 S.W.3d at 542 (affirming denial of Rule 29.15 motion where trial counsel testified at the evidentiary hearing to "deliberate, strategic reasons for not objecting to the specific testimony at issue."). Accordingly, the motion court did not clearly err in overruling Webb's amended Rule 29.15 motion.

Point denied.

9

(Doc. 4-14 at 13-15 (footnotes omitted).)

### A. Performance

Even if the Court were to determine that the Missouri Court of Appeals unreasonably applied *Strickland* in concluding that Petitioner's trial counsel was not ineffective, the Court would not grant the habeas petition unless the Court determined that Petitioner's constitutional rights were violated. 28 U.S.C. § 2254(a). To reach this conclusion, the Court would have to determine that Petitioner has satisfied the prejudice prong of *Strickland*. *See Wiggins*, 539 U.S. at 525 (2003) ("In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense."). Because the Missouri Court of Appeals never reached the prejudice issue, the Court will review that issue de novo. *See id.* at 534 (". . . our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis").

### B. Prejudice

Although Petitioner is correct in his contention that this Court may review the prejudice prong of the *Strickland* test de novo because the state court did not address the issue, Petitioner goes so far as to posit that "[s]ince respondent failed to address the issue of *Strickland* prejudice, this omission must be viewed as a tacit concession that this evidence could have reasonably affected the outcome." Petitioner argues that, therefore, the dispositive issue in this case is "whether Petitioner can overcome the barriers erected by § 2254(d) to permit this Court to review the issue of trial counsel's performance *de novo* and grant the writ." (Doc. 9 at 19-20.) Petitioner cites *Wiggins v. Smith*, 539 U.S. 510 (2003) (in which the court performed the analysis under *Strickland's* prejudice prong without deferring to the state court's decision because it found the state court's resolution of *Strickland's* performance prong involved an "unreasonable application" of law, and the state court had considered the performance prong dispositive), and *Rompilla v. Beard,* 545 U.S. 374 (2005) (same).

First, although Petitioner is correct that the Court may review *Strickland's* prejudice prong de novo because the state court only analyzed the performance prong, this does not eliminate, lessen, or shift Petitioner's burden to prove *Strickland* prejudice. Second, and relatedly, the Court notes that Petitioner appears to misapprehend whose burden it is to prove prejudice. Respondent has no obligation to address or disprove *Strickland* prejudice, and the Court does not accept Petitioner's invitation to interpret Respondent's decision not to address *Strickland* prejudice as a

10

"concession" on the issue. Rather, *Strickland* is clear that it is Petitioner's burden to establish prejudice: "[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 696. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," and "requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks omitted). In considering prejudice in the federal postconviction context, § 2254(d)(2) requires "a petitioner [to] show that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Perry*, 356 F.3d at 889 (internal quotation omitted).

The extent of Petitioner's effort to make such a showing is limited to the following paragraph:

> On the issue of prejudice, there is little or no evidence independent of [Stepmother's] guilty plea, that would have proven beyond a reasonable doubt, that she caused the death of petitioner's son. Had this inadmissible evidence been properly excluded, there is a reasonable probability that petitioner would have been acquitted of felony murder.

(Doc. 9 at 26.)

The Court disagrees with Petitioner's conclusory characterization of the evidence. There was evidence that, on the day of Victim's death, Stepmother kicked Victim, knocking him to the floor, and continued kicking him repeatedly between the legs and in the abdomen as he tried to get away screaming. There was evidence that between his screams, Victim was vomiting as Stepmother continued kicking him. There was evidence that when Stepmother finally stopped kicking Victim, he stumbled outside and fell on his knees then to the ground and his eyes were closed. There is evidence Stepmother was not answering the paramedics' questions when they arrived in response to a 911 call reporting a four-year-old child (Victim) who was not breathing. There was evidence that, by the time paramedics were trying to help, Victim's heart was not beating, whereas the paramedic would expect to still observe electrical activity in the heart if Victim's breathing had stopped only shortly before the 911 call.

Additionally, the autopsy evidence showed that Victim's most significant injury, and the ultimate cause of his death, was a laceration in the small bowel, which the medical examiner

testified is a type of injury caused by blows to the abdomen in young children and would cause a person suffering such injury to go into shock rapidly, to be immediately symptomatic, and cause extreme pain. The examiner testified that Victim would probably be rolling around in pain until he passed out. There was evidence that while playing a game on the floor with his foster mother, Brother spontaneously began rolling around on the floor and then said that is what happened to Victim "when his mommy kicked him."

There was also evidence that Victim's preschool teacher became concerned with Victim's bruising and, after emailing with the family, his attendance became irregular and eventually Stepmother removed Victim from the school. When he returned a few months later, Victim told a teacher he sometimes did not feel good, and when asked what hurts when he feels bad, Victim responded that it hurts when his mom kicks him in the stomach with her foot. After later concerns with additional bruising and apparent wounds, a report was made to the child abuse hotline, and later that month, when Victim came to school with a bruise on his cheek a few weeks before his death, Victim told his teacher, "my mom said it's none of your business. She said, tell you none your . . . businesses." The evidence showed that Victim then did not attend school for the remaining weeks before his death.

On the issue of prejudice, the Court finds the above to be abundant evidence independent of Stepmother's guilty plea, that would have allowed a jury to find beyond a reasonable doubt that Stepmother caused the death of Victim. Accordingly, the Court finds Petitioner has not shown that the facts underlying his claim would be sufficient to establish by clear and convincing evidence that but for defense counsel's failure to object to evidence and argument about Stepmother's guilty plea, no reasonable factfinder would have found Petitioner guilty of the charged offenses, including felony murder.

### IV. Certificate of Appealability

Finally, under Rule 11 of the Rules Governing Section 2254 Proceedings, the Court must issue or deny a certificate of appealability when it enters a final order adverse to a habeas petitioner. A certificate of appealability may be issued "only if [Petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Because Petitioner has made no such showing, the Court declines to issue a certificate of appealability.

V. **Conclusion**

Therefore, it is **ORDERED** that:

(1) Petitioner's habeas petition is **DENIED**;

(2) a certificate of appealability is **DENIED**; and

(3) this case is **DISMISSED**.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: March 21, 2024